```
 1              IN THE UNITED STATES DISTRICT COURT

 2                      DISTRICT OF KANSAS

 3  WILLIAM ARTHUR JOHNSON        )
                                  )
 4              Plaintiff,        )        District Court
                                  )        Case No.23-2057
 5  ESTATES OF STEVEN B.          )
    HAZEN, BY AND THROUGH         )
 6  DANIEL W. CRAMER, SPECIAL     )
    ADMINISTRATOR AND HAZEN       )
 7  FARM,                         )
                 Defendant.       )
 8  _____)

 9   TRANSCRIPT OF JURY TRIAL, VOLUME I, MASTER TROOPER POLSON'S

10    DIRECT AND REDIRECT EXAMINATION ONLY(PARTIAL TRANSCRIPT)

11      On the 21st day of April, 2025, came on to be heard in the

12  proceedings in the above-entitled and numbered cause before the

13  HONORABLE ERIC F. MELGREN, Judge of the United States District

14  Court for the District of Kansas, sitting in Wichita, Kansas,

15  and commencing at 8:30 a.m.  Proceedings recorded by stenomask

16  voice writer.  Transcript produced by computer-aided

17  transcription.

18                      APPEARANCES

19  The plaintiff appeared by and through:

20      RICHARD JAMES AND CHRISTOPHER OMLID
        DEVAUGHN JAMES INJURY LAWYERS
21      3241 N. TOBEN
        WICHITA, KS 67226
22
    The defendant appeared in person and by and through:
23
        PATRICK MURPHY
24      WOODARD, HERNANDEZ, ROTH AND DAY
        245 N. WACO, SUITE 260
25      WICHITA, KANSAS 67202
```

```
 1   DIRECT AND REDIRECT OF MASTER TROOPER POLSON ONLY.  THE REST OF
 2                 THE TRANSCRIPT WAS NOT REQUESTED
 3                      DIRECT EXAMINATION
 4   BY  MR. JAMES:
 5   Q.   Sir, once you've had an opportunity to sit down, if you'll
 6   pull that mic up next to you and we'll test the sound with --
 7   would you state your name and position, sir?
 8   A.   Michael Polson, state trooper with the Kansas Highway
 9   Patrol.
10   Q.   And do you have any titles as a state trooper?
11   A.   I'm a master trooper.
12   Q.   I want to point out to you Exhibit 16, which is, I believe,
13   the paper you have in front of you.  It will also come up on the
14   screen in front of you here in a moment.
15        Can you tell the jury what this is?
16   A.   This is our Kansas Motor Vehicle Crash Report.
17   Q.   And, Trooper, you're the first witness at trial.  The
18   attorney's have talked.  What they said is not evidence, so even
19   though the jury may have seen some of these things, we have to
20   ask you some quite obvious questions to get them in evidence, so
21   I apologize for that and the time.
22        Can you tell the jury where your name appears on this?
23   A.   It is on the top part of the report under Investigating
24   Officer Name.
25   Q.   And can you tell us the date and time of the collision,
```

1   sir?

2   A.   It was on January 4, 2022, at 9:05 a.m.

3   Q.   And you performed an investigation; true?

4   A.   That's correct.

5   Q.   Did weather have anything to do with this collision?

6   A.   No.

7   Q.   Did the road conditions have anything to do with this

8   collision?

9   A.   No.

10  Q.   Can you tell the jury who was vehicle one as we see here?

11  A.   The driver?

12  Q.   Yes.

13  A.   The driver of vehicle one was Mr. Hazen.

14  Q.   Could you look on page 2?  I think the driver of vehicle

15  one is Mr. Johnson.

16  A.   I'm sorry about that.  It's Mr. Johnson.

17  Q.   Okay.  So vehicle one is Johnson and vehicle two is Hazen?

18  A.   That's correct.

19  Q.   And you wrote this narrative description right here, right

20  on the front there where we can see?

21  A.   Yes.

22  Q.   Do you mind reading that into the record?

23  A.   Vehicle one and vehicle two were eastbound on U.S. 54 at

24  milepost 133.  Both vehicles entered the passing lanes with

25  vehicle one in front of vehicle two.  Vehicle one did not move

```
 1   over into the right lane, so vehicle two moved to the right lane
 2   and began to pass vehicle one.  As vehicle two went by vehicle
 3   one, vehicle two made an unsafe lane change and struck vehicle
 4   one, causing vehicle one to lose control and enter the north
 5   ditch.
 6   Q.   Okay.  And that indeed was the Johnson vehicle that entered
 7   into the north ditch?
 8   A.   That is correct.
 9   Q.   How did you get chosen to be the investigative officer on
10   this collision?
11   A.   Whenever a wreck comes out, especially on a state or
12   federal highway and we respond -- usually we're the ones that
13   investigate the crash.
14   Q.   Can you tell the jury what type of training you have in
15   commercial motor vehicles?
16   A.   In commercial motor vehicles, I've had two weeks of CVSA
17   training and every year we have to go to CVSA in-service.
18   Q.   And you are identified by the highway patrol as what they
19   call CVSA certified?
20   A.   That's correct.
21   Q.   And that's a certification that you've kept up since you've
22   received it?
23   A.   Yes, sir.
24   Q.   And we see it throughout the reports and it might be
25   obvious, but, again, just laying some foundation.  What does CMV
```

1    stand for, sir?

2    A.    CMV stands for commercial motor vehicle.

3    Q.    And both of these trucks would be -- semis would be CMVs?

4    A.    Correct.

5    Q.    And they're professional drivers with a special driver's

6    license; true?

7    A.    Correct.

8    Q.    Okay.  Could you turn to page 2, Mr. Omlid.

9              And, Trooper Polson, you can choose to look at the

10   screen or your report.  Did you prepare this diagram?

11   A.    Yes, I did.

12   Q.    Whose vehicle is shown on the side of the road?

13   A.    That is Mr. Johnson's vehicle.

14   Q.    Okay.  What did you do to prepare this vehicle as far as

15   the -- this diagram, the measurements and things like that, sir?

16   A.    First, I located a reference point, which would be a

17   culvert and a cement slab.  Then, I took my measurements from

18   there to the vehicle and the trailer to tie the vehicle in onto

19   the diagram.

20   Q.    Can you tell the jury what AOI is?

21   A.    That is area of impact.

22   Q.    Based upon your investigation, what lane did you determine

23   that the impact occurred in?

24   A.    The impact occurred in the left lane.

25   Q.    Whose vehicle did you learn was occupying this left or

1    inside lane?

2    A.    Mr. Johnson's vehicle.

3    Q.    Whose vehicle did you learn was occupying the outside lane?

4    A.    Mr. Hazen's vehicle.

5    Q.    Based upon your investigation, how did these vehicles come

6    into contact?

7    A.    These vehicles came into contact due to an unsafe lane

8    change in the left -- in the inside lane.

9    Q.    And an unsafe lane change by the Hazen vehicle?

10    A.    Correct.

11    Q.    I want to transition to ask you a little bit about your

12    dash cam, sir.  We're going to see it a little bit, but could

13    you explain to the jury what's different about the Kansas

14    Highway Patrol dash cam as opposed to, maybe, a body came that

15    they might see on TV?

16    A.    So our dash cam, we have a camera that is in our front

17    windshield.  It's facing out in front of our vehicle, and it

18    basically just captures everything in front of our car.  We have

19    one in the back of our car too.

20    Q.    And was the patrol car you were driving equipped with a

21    dash cam?

22    A.    Yes, it was.

23    Q.    I'm going to show you a portion of that dash cam and I'm

24    going to ask you some questions, but first I need to lay some

25    foundation.

1            Can you explain to the jury how the microphone pack

2    system works and things that might interfere with the microphone

3    audio that we get?

4    A.    So I have a mic pack that is on my belt, and so that

5    captures all of the audio around my person whenever I'm out of

6    the car.  Things that could interfere with it could be wind or

7    sirens or getting too far away from the vehicle.

8    Q.    So if there's portions of your dash cam that we can't hear

9    the audio, is that fairly typical?

10    A.    That is typical.

11    Q.    Especially if we're out on a windy day?

12    A.    Correct.

13    Q.    And I want to talk a little bit about sometimes very loud

14    on your dash cam comes dispatch.  Can you tell the jury what

15    that is?

16    A.    I kind of have two dispatch centers.  One is the local

17    county dispatch and mine is the State Highway Patrol dispatch,

18    and they come over the radio and tell me information basically.

19    Q.    So there are times when -- and we're going to watch a

20    series of your videos -- there are times when we're going to

21    hear dispatch come really loud, and that's not necessarily

22    always about this collision; true?

23    A.    Correct.

24    Q.    Because they could have something going clear on in another

25    location and that would still come on the dispatch?

```
1    A.    That is correct.

2    Q.    I would like to play 41-A.

3                         (Video played.)

4    Q.    Again, a foundation question.  Is that your dash cam?

5    A.    Yes, it is.

6    Q.    And is that your voice hoping that the vehicle stops so you

7    can get around them and get what you need to do?

8    A.    Yes.

9    Q.    Okay.  Can you -- just in the briefest, broadest terms --

10   just tell the jury what's going on here and what you're doing?

11   A.    That is the first part of my video that shows me en route

12   to the crash that occurred.

13   Q.    Okay.  Mr. Omlid, would you play 41-B?

14                        (Video played.)

15   Q.    First of all, I know you drive this all the time so you

16   know second hand what's going on, but can you tell the jury what

17   direction you're headed out of Pratt and where you're headed?

18   A.    I'm heading west on 54 outside of Pratt to this crash.

19   Q.    And in that case, when dispatch -- did you hear dispatch

20   say somebody's crawling out --

21   A.    Yes, I did.

22   Q.    And did you take that to be the crash that you were going

23   to?

24   A.    Yes.

25   Q.    Okay.  And you're going to get out there and learn that's
```

1    Mr. Johnson; true?

2    A.    That's correct.

3    Q.    41-C, please, Mr. Omlid.

4                         (Video played.)

5    Q.    Is that you approaching the truck?

6    A.    Yes.  That's me on the left.

7    Q.    My understanding from the report is even though other

8    officers are there, when you come, the crash is handed over to

9    you and you're in charge.  Could you tell the jury about that?

10    A.    Yes.  So, like I said, if a wreck happens on a state or

11    federal highway, we show up.  Most of the time -- depending on

12    where you're at in the State -- but in my area, the county

13    deputies will allow us to investigate it since we have more

14    training and experience in crash investigations.

15    Q.    We have a view of what you saw from them, the patrol car

16    and it's going to get a little farther away, but can you explain

17    to the jury what you saw not only from this point but as you

18    walked closer to the Johnson vehicle?

19    A.    I see a truck tractor, semitrailer laying in the north

20    ditch on its side.

21    Q.    What was your priority -- I'm sorry.  Did I cut you off?

22    A.    No, you didn't.

23    Q.    If I do that -- ever -- let me know and I'll -- what was

24    your priority when you get to the scene, Trooper?

25    A.    First priority for us is to check for anybody that's

1    injured and try to get them EMS help.

2    Q.   Okay.  The next one I want to play is the clip right after

3    this.  It's 41-D.  It's a longer clip.  I'm going to play the

4    whole thing just so you and the jury have a chance to hear it,

5    and then I'm going to go back and play it in portions to ask you

6    some questions.  If at any time you feel you can't testify

7    because it needs to be played again, just ask and we can play it

8    again.

9              So if you would play 41-D, Mr. Omlid.

10                        (Video played.)

11   Q.   Okay, Trooper, we're going to play the first 50 seconds of

12   the same video again, and my question for you is going to be:

13   What are you trying to figure out as you approach this vehicle

14   in the process of your investigation?

15             If you would play this to 50, and then stop if you

16   could.

17                        (Video played.)

18   Q.   Question:  What are you trying to figure out here at this

19   time, Trooper?

20   A.   Right now I'm trying to figure out who my driver is for the

21   vehicle and also if we have any witnesses and basically a brief

22   synopsis of what happened.

23   Q.   And the voice we primarily hear other than yours is whom in

24   this video?

25   A.   That is Mr. Johnson's voice.

1  Q.    So far in this 50-second clip, what is it that you
2  understand happened?
3  A.    I understand that Mr. Johnson was saying that he was in the
4  left lane and the other semi went around him honking his horn
5  and somehow hit him with his trailer.
6  Q.    Okay.  Mr. Omlid, if you'd line up -- press play there.
7          And the questions going to be, again, what did you
8  learn in this section and about the point of contact in this
9  next clip that we will hear?
10                        (Video played.)
11  Q.    What did you learn in this section, Trooper?
12  A.    Mr. Johnson told me that the other vehicle hit him with his
13  trailer and made him swerve.
14  Q.    Okay.  We are going to play 41-D through the end of the
15  clip and then I'll ask you a series of questions about that.
16                        (Video played.)
17  Q.    Okay.  We're going to try to do things sequentially, but
18  you did -- ultimately did an investigation and came to a
19  comparison of what Mr. Johnson said?  What things did
20  Mr. Johnson tell you in this first initial visit that proved to
21  be true and which ones were not?
22  A.    Things that were true was Mr. Johnson was in the left lane.
23  The other vehicle passed him and the trailer of the other
24  vehicle struck Mr. Johnson's vehicle causing him to lose
25  control.

1          The things that -- the only thing that wasn't

2    necessarily true was the load that he said that the red trailer

3    had on it.

4    Q.    Does that surprise you that he was mixed up about the load

5    on the red trailer?

6    A.    Not necessarily.

7    Q.    Can you tell us why?

8    A.    A lot of times when people are in high-stress situations

9    like this they don't remember every single detail.

10   Q.    I want to show you Exhibit 17.  It's been read to the jury.

11   We don't have to read it again.  But can you tell the jury why

12   this was completed?

13   A.    We always try to obtain a voluntary witness statement from

14   basically everyone involved in a crash.

15   Q.    And you understand in this written statement that Johnson

16   thought the other driver was mad because he was going 65 miles

17   an hour?

18   A.    Correct.

19   Q.    And understand Johnson saying Mr. Hazen gave him the middle

20   finger; correct?

21   A.    Yes.

22   Q.    Okay.  I want to play 41-F, and I want to ask you -- the

23   question I'm going to ask you is in regards to dash cam and what

24   that means to you.

25                      (Video played.)

1    Q.    Okay.  Can you tell the jury -- go ahead and play that full

2    thing, would you, Mr. Omlid?

3                            (Video played.)

4    Q.    Okay.  The very end, did you hear your comment about dash

5    cam?

6    A.    Yeah.

7    Q.    Could you tell the -- could you tell the jury the

8    significance of hearing the term "dash cam"?

9    A.    Whenever I hear that somebody has a dash cam, it's a good

10   thing for me because it will tell me exactly what happened.

11   Q.    So at that point, you only have Johnson's story, but you

12   know I have a dash cam that's going to reveal what happens;

13   true?

14   A.    Correct.  That's true.

15   Q.    41-G, please, Mr. Omlid.

16               Questions on this one are going to be about access to

17   the dash cam.

18                            (Video played.)

19   Q.    Did you hear the term "hardwired" in that?

20   A.    Yes.

21   Q.    Okay.  Did you have access to the dash cam at that time?

22   A.    No.

23   Q.    What does hardwire mean?

24   A.    So it means whenever the -- the dash cam is basically wired

25   to the vehicle somehow or the battery.  So whenever the vehicle

1   is off, there's no way to look at it.

2   Q.   Did the driver, Mr. Johnson, control his dash cam?

3   A.   Not that I know of.

4   Q.   I mean, he wasn't able to give -- that was a bad question.

5   I'm sorry.  He wasn't able to give you a copy of the dash cam

6   right there?

7   A.   No.  Not there.  No.

8   Q.   Okay.  But you were able to later obtain it?

9   A.   Yes.

10  Q.   41-H, please, Mr. Omlid.

                        (Video played.)

11

12  Q.   When you tell Johnson that you want the dash cam, what was

13  his response in this sequence?

14  A.   It's hard for me to hear, but I think he said that we're

15  going to have to get ahold of the company to send it to me.

16  Q.   Yes.  That's in there.  I'd like for you to listen to it

17  one more time -- and I think but I need your testimony -- he

18  says, whatever is going to come out is going to come out.

19            But could you play that again, Mr. Omlid?

20                        (Video played.)

21  Q.   Did you hear it that time?

22  A.   Yes, sir.

23            MR. MURPHY:  Your Honor, I objective.  Repetitive and

24  leading.

25            THE COURT:  Overruled.

1  BY  MR. JAMES:

2  Q.   Did you hear him say, whatever comes out is going to come

3  out?

4  A.   Yes, I did.

5  Q.   And at that time, you confront Mr. Johnson with, Hey,

6  they're saying you're the aggressor; true?

7  A.   That is correct.

8  Q.   And the witness -- you didn't know it at this time -- but

9  you later learned the witness saying he was the aggressor, was

10  Mr. Hazen's son; true?

11         MR. MUPRHY:  Objection.  Leading.

12         THE COURT:  Sustained.

13  BY  MR. JAMES:

14  Q.   Who did you learn -- same question.  I just have to ask it

15  in a different way.  Did you hear the part of aggressor in

16  there?

17  A.   Yes.

18  Q.   And who did you later learn was the witness saying Johnson

19  was the aggressor?

20  A.   Mr. Hazen's son.

21  Q.   At that time, did you know that this witness pointing the

22  finger at Johnson was related to Hazen?

23  A.   No.  I did not know his name.

24  Q.   Okay.  I want to take you to Exhibit 18.  And these are, I

25  believe, photos that you took related to your investigation.

```
1   And once these come up, I want Mr. Omlid to flash through these
2   and then my question is going to be:  Can you confirm these are
3   the photos that you took?
4           Are these photos of your investigation?
5   A.   Yes, they are.
6   Q.   Mr. Omlid, if would you go back to number two of
7   Exhibit 18.
8           Can you tell the jury what this is?
9   A.   This is a picture of the trailer of Mr. Hazen's vehicle.
10  Q.   Could you show three, four, and five, Mr. Omlid, and six,
11  please?
12          Okay.  Now my question is there's another dash cam
13  video that's Investigator Mr. Little that's involved in that.
14  And my first question once we play that is going to be:  Are
15  these photos the same thing you and Mr. Little are looking at in
16  this video?  And I'll repeat the question again but I just want
17  you to know what we're looking at.
18          Mr. Omlid, 42-A, please, sir, when you have a moment.
19  I know that's hard to switch back and forth like that.
20          Okay.  Who do we have on the right there?
21  A.   That is Mr. Steve Little.
22  Q.   Okay.  Can you explain to the jury, there's points where we
23  are going to see you guys but we're not going to be able to hear
24  you guys.  Can you tell the jury what's going on with the dash
25  cams?
```

```
 1   A.   So this dash cam is from Mr. Little's patrol car.  So the
 2   audio is going to be coming from his mic pack, which is on his
 3   belt.  So if I'm not around Mr. Little, it won't pick my voice
 4   up.
 5   Q.   So there is not any videos missing or anything.  It's just
 6   a matter of we've got a camera and then we've got a separate mic
 7   pack?
 8   A.   That's correct.
 9   Q.   Could you play this, Mr. Omlid?
10                      (Video played.)
11   Q.   The photos that we saw, is that what you and Mr. Little are
12   looking at here?
13   A.   Yes.
14   Q.   Would you please play 42-B?
15                      (Video played.)
16   Q.   Can you say what's happening in this snapshot here?
17   A.   It appears that Mr. Little is going back to his car and I
18   am talking to Mr. Hazen.
19   Q.   And that's why no audio?
20   A.   That is correct.
21   Q.   42-C, Mr. Omlid, please.
22                      (Video played.)
23   Q.   Did you hear in that audio where Mr. Hazen said he was
24   100 percent sure and knew that Johnson came into his lane?
25   A.   Yes.
```

1    Q.    And that's not indeed what the video showed; true?

2    A.    That is not with the video showed.

3    Q.    Did you hear in that audio where Mr. Hazen said he caught

4    up to him in the second passing lane?

5    A.    Yes.

6    Q.    And you drive this frequently; correct?

7    A.    Yes.

8    Q.    And there's three passing lanes; correct?

9    A.    Well, it depends what stretch of highway -- how far you

10   want to go west.  But in pratt County, I believe, there's only

11   two passing lanes.

12   Q.    Okay.  And this was the passing lane closest to Pratt?

13   A.    That's right.  Yes.

14   Q.    Okay.  And there will be some mapping testimony later.  And

15   so when he said he caught up to him in the second passing lane,

16   you're taking Hazen saying that he caught up to Johnson in the

17   passing lane before this one; is that correct, or do you know?

18   A.    I don't know.

19   Q.    Okay.  Then you have Mr. Hazen write a statement just like

20   you did Mr. Johnson; correct?

21   A.    Correct.

22   Q.    Standard police procedure?

23   A.    Yes.

24   Q.    Okay.  I'm going to show you three clips and the third

25   one -- because it takes so long -- we're going to click through

1   so we don't just all have to sit here and watch it.

2              42-E, please, Mr. Omlid.

3                          (Video played.)

4   Q.   Can you tell the jury what you said there?

5   A.   I said that there's dash cam in the other truck but there's

6   no power to it to retrieve the video right now.

7   Q.   42-F, please, Mr. Omlid.

8                          (Video played.)

9   Q.   Did you see your gesture there?

10  A.   Yes.

11  Q.   What was your gesture there?

12  A.   It was kind of like a hurry up gesture.

13  Q.   Okay.  Let's play 42-G.

14                         (Video played.)

15  Q.   Can you tell the jury -- no sound on this -- can you tell

16  the jury what's happening here?

17  A.   This was the moment that I gave Mr. Hazen the witness

18  statement to fill out.

19  Q.   And this video, almost seven minutes long, is this the

20  entirety of the time it took him to write that statement?

21  A.   I'm not sure without watching the video.

22  Q.   Okay.  Sounds good.

23              Do you know what is happening there?

24  A.   Yeah.  He asked me what time it was.

25  Q.   And is this the same time that you and Mr. Little are

1  having the conversation about the dash cam and it not being

2  available?

3  A.   I do believe so.

4  Q.   Trooper Polson, with your permission I'm going to have

5  Mr. Omlid click the 30 second forward and see if what you

6  observe, he is still -- I think you've got a 30 second down

7  there at the bottom, Chris, where you can click -- and see if

8  Mr. Hazen is still writing the statement.

9         Is that you guys still waiting on him to write the

10  statement?

11  A.   Yes, sir.

12  Q.   Could you give us another 30-second click?  And another.

13  And still another, to save everybody's time.

14         And I think, Trooper, here is where we will shortly

15  see your hand gesture.

16         Before asking you additional questions, I want to show

17  you Exhibit 17-2, which is the Hazen statement.

18         Is this the statement Mr. Hazen was writing in that

19  approximate seven-minute period?

20  A.   Yes.

21  Q.   I was wondering, based upon your experience, if you thought

22  the fact that it took him that long to write this statement was

23  unusual?

24  A.   I believed it was unusual.

25  Q.   Incredibly long for a statement that short?

```
 1              MR. MUPRHY:  Objection.  Leading.

 2              THE COURT:  Overruled.

 3   BY  MR. JAMES:

 4   Q.   You can go ahead and answer.  If the judge says sustained,

 5   that means I have to redo the question, but he said overruled.

 6   A.   What did you ask me?

 7   Q.   Unusually long to write a statement this short?

 8   A.   It was longer than I'm used to based on my experience.

 9   Q.   And it was about -- there's not even seven sentences in

10   this statement.  It was taking him more than a minute to write

11   each sentence; true?

12              MR. MUPRHY:  Objection.  Leading.

13              THE COURT:  Overruled.

14   A.   Yes.

15   BY  MR. JAMES:

16   Q.   Do you remember anything else Mr. Hazen said about the

17   collision other than what we've heard in audio and what's in

18   this statement?

19   A.   No, I don't.

20   Q.   Before Steven Hazen wrote his statement, was there time for

21   him to collaborate or to cooperate with his son Jule to make

22   their statements aligned about who came into what lane?

23   A.   There would have been time to talk to each other, yes.

24   Q.   I want to ask you some questions about Jule Hazen.  Did you

25   know at the time of the investigation that you had a father and
```

```
 1   son trucking together?

 2   A.    No, I did not.

 3   Q.    And they were driving similar looking trucks; true?

 4   A.    I don't even know what kind of truck Jule was driving.

 5   Q.    Thank you.  Sorry about that.

 6             Can you go to 17-3, Mr. Omlid?

 7             And this is indeed the statement of Jule there?

 8   A.    Yes.

 9   Q.    And note that it says Jule H.  We don't get Jule Hazen do

10   we, in that statement?

11   A.    No.

12   Q.    And, obviously, per court rules, we've whited out addresses

13   and phone numbers.  But Hazen is just blank in yours too, isn't

14   it?

15   A.    It isn't blank on mine.

16   Q.    Okay.  It says "Hazen" on there?

17   A.    Yes, sir.

18   Q.    Thank you so much.  Okay.  Can we read -- in 17-3, could

19   you read that statement to the jury?

20   A.    The truck that wrecked was in passing lane and flatbed was

21   in right lane.  Reefer truck swerved at flatbed.

22   Q.    Let me pause you right there.  Did you find anything in

23   your investigation to support those statements?

24   A.    No, I did not.

25   Q.    Could you read the rest?
```

1    A.    I didn't think they made contact but sure could have.

2    Reefer then shot across to north ditch.  I thought he

3    overcorrected after swerving.

4    Q.    Did anything in your investigation reveal swerving by

5    Mr. Johnson?

6    A.    No.

7    Q.    I want to go to some scene photos that -- we've looked at

8    all of them, but I want to specifically talk about Exhibit 18,

9    number 13, and it's a photo you'll see of you taking a photo of

10    the roadway.  And I want to ask you -- the jury -- what you're

11    trying to establish here in 13 through 23.

12              Mr. Omlid, if you'll...

13              Specifically 15 and 16, what are you doing with

14    these -- what are you looking for with these road markings, sir?

15    A.    Right here I am trying to get a picture of the entire

16    highway and the vehicle and capture any road markings that I can

17    find.

18    Q.    And you determined that based upon the road markings --

19    even before you had the video -- that it appeared -- the point

20    of impact or the AOI happened in the inside lane on Johnson's

21    lane; true?

22    A.    I don't know if I knew that.  I knew it happened somewhere

23    close to the dotted line.

24    Q.    Okay.  So then it wasn't until you saw the video that you

25    knew it happened in Johnson's lane?

1  A.    Correct.

2  Q.    I want to go to Exhibit 16, page 5, which is your report,

3  and it's going to talk about when you got the video.  And so

4  accident on January 4th, this spot of the report on page 5 at

5  the bottom is six days later, and I'd like for you to read on

6  January 10th, if you could read that?

7  A.    On January 10th, 2022, I was sent a copy of the dash cam

8  video from Hirschbach Motors recorded from the perspective of

9  vehicle one.  The video clearly shows vehicle one in the left

10  lane going east.  It then shows vehicle two begin to pass

11  vehicle one on the right.

12        Then it shows vehicle two beginning to make an unsafe

13  lane change in front of vehicle one by not allowing enough

14  clearance between the two vehicles.  Vehicle two crossed the

15  dotted white line into the path of vehicle one and the trailer

16  of vehicle two struck the front of vehicle one, causing vehicle

17  one to lose control and enter the north ditch.

18  Q.    And those are your words that you wrote?

19  A.    Yes, they are.

20  Q.    And words you still believe to be correct?

21  A.    Yes.

22  Q.    Okay.  I'd like to show you the video that you got from

23  Hirschbach Motors -- which you later learned was Johnson's

24  employer; correct?

25  A.    Yes.

1   Q.    31 please, Mr. Omlid.

2            And the jury has seen this.  This is the outward

3   facing camera.

4                        (Video played.)

5   Q.    Could you tell the jury what you had to do to get this

6   video?

7   A.    I had to contact the company, and they told me that they

8   would send it to me via email and they finally did on January

9   10th.

10  Q.    And you -- as I understood, you gave Johnson a ride back

11  into town after this collision; correct?

12  A.    Yes.

13  Q.    And at no time did he have video?  You had to go to

14  Hirschbach?

15  A.    That is correct.

16  Q.    Okay.  I want to play 31 again one more time and I want to

17  pause at the six-second mark, Mr. Omlid.  And I want to ask,

18  Trooper Polson, what you see.

19                        (Video played.)

20  Q.    Can you tell the jury what you see?

21  A.    I see Mr. Johnson in the left lane and I see Mr. Hazen's

22  vehicle cross the dotted white line into Mr. Johnson's lane and

23  Mr. Hazen's trailer striking Mr. Johnson's vehicle.

24  Q.    And what did you call this in your report?

25  A.    This would have been an unsafe lane change.

1    Q.    Could you play Exhibit 32, Mr. Omlid?

2                            (Video played.)

3    Q.    Okay.  Something was said in opening, but need to get it in

4    evidence.  This isn't a video that you had when you made that

5    report; true?

6    A.    I did not have access to the in-cab video.

7    Q.    Okay.  And Mr. Murphy said it.  Something that came out

8    through a subpoena in this case.  But when you were making your

9    decision on unsafe lane change, you had the right side there,

10   that forward facing; correct?

11   A.    Yes, sir.  That's correct.

12   Q.    Mr. Omlid, can you play this and pause at the one-second

13   mark?

14              Can you tell the jury what you see in this window area

15   that I circled right there?

16   A.    That appears to be Mr. Hazen's trailer.

17   Q.    Okay.  I'm going to get my mark off of here, and then I'm

18   going to have it go forward and play please, Mr. Omlid.

19              Now that you've seen this video, did Mr. Johnson look

20   like he was expecting the car to come in his lane?

21              MR. MUPRHY:  Objection, Your Honor.  Speculation.

22   Foundation.

23              MR. JAMES:  I said look on the video.

24              THE COURT:  I'm going to sustain the objection.

25

BY MR. JAMES:

Q.   Whether we look from either of the cameras, and we see the truck, how confident are you of the impact happening in the Johnson Lane?

A.   Can you ask that one more time?

Q.   Yeah.  How confident are you that this impact happened in Johnson's inside lane?

A.   I'm 100 percent confident.

Q.   Who provided you the accurate testimony on the day of the collision about the impact, was it Mr. Johnson or Mr. Hazen?

A.   Mr. Johnson.

Q.   Did Mr. Hazen allow enough clearance between the two vehicles to make a lane change?

A.   No.

Q.   Is that the basis for you calling it an unsafe lane change?

A.   That is correct.

Q.   I don't have any additional questions.

                         REDIRECT EXAMINATION

BY MR. JAMES:

Q.   Trooper Polson, do you recall some testimony that Mr. Murphy asked you, if there's some interchange between two drivers whether it's -- two drivers whether it's one flipping the other off -- about somebody should back off.  Do you recall that?

A.   Yes.

1   Q.   In fact, both drivers should back off from a situation;

2   correct?

3   A.   Yes.

4   Q.   There was also an implication about Mr. Johnson did not

5   make any movement to his left when he saw the Hazen vehicle.  Do

6   you recall that?

7   A.   Yes.

8   Q.   There was a double yellow line on his left; correct?

9   A.   Correct.

10  Q.   Would you advise anybody to cross a double yellow line?

11  A.   I would not.

12          MR. MURPHY:  Objection.  Foundation.  Speculation.

13          THE COURT:  Overruled.

14  A.   I would not advise anybody to cross the center yellow line.

15  BY MR. JAMES:

16  Q.   In fact, that would be against the law, wouldn't it?

17  A.   Yes, it would.

18  Q.   I'm happy to show you the horn honk again in 32, and my

19  question for you is going to be:  Do you think there's anything

20  inappropriate about this horn honk?

21                    (Video played.)

22          MR. MUPRHY:  And, Your Honor, I don't know if that

23  question has been posed or if it's going to be posed, but I have

24  an objection if it's going to be --

25          THE COURT:  Well, the question was:  Do you think

```
 1  there's anything inappropriate about the horn honk?  And I'm
 2  going to show you the video.
 3              MR. MURPHY:  Okay.
 4              THE COURT:  So the question is pending.
 5              MR. MURPHY:  Okay.  I didn't hear that and my
 6  apologies, Your Honor.  Foundation, speculation, and relevance.
 7              THE COURT:  Overruled.
 8  A.   I do not find anything unnecessary about the horn honk.
 9  BY MR. MUPRHY:
10  Q.   In fact, didn't -- even Mr. Murphy mentioned to you that
11  sometimes you honk the horn to let other another drivers know
12  they're there; true?
13  A.   True.
14  Q.   So based on those facts, you did not see anything
15  inappropriate or wrong about the horn honk?
16  A.   No.
17  Q.   I want to play 42-D for you only because I said I played it
18  and asked you some questions and there was a question on the
19  record as to whether I did.  But it's an interaction you're
20  having with Mr. Hazen, and I'm going to ask you some questions
21  about it.
22                      (Video played.)
23  Q.   In that question, do you hear you and Mr. Hazen exchange
24  that there's three passing lanes between Greensburg and Pratt?
25  A.   Yes.
```

```
1   Q.   And did you hear Hazen say, I don't think I caught up to

2   him in the second passing lane, which would be the one in the

3   middle?

4   A.   Did he say I didn't catch up to him until the second one?

5   Q.   You know, probably to be accurate, let's play it again.

6   A.   Okay.

7   Q.   And then whatever it says, it says.  I'm not trying to

8   change your testimony.

9                        (Video played.)

10  Q.   Pause there.

11       Did you hear him say, I didn't catch up with him until

12  the second or so?

13  A.   Yes.

14       MR. MUPRHY:  Your Honor, I object.  He can't testify.

15  It's leading.

16       THE COURT:  Overruled.

17  BY  MR. JAMES:

18  Q.   And then, where this collision happened would be the third

19  passing lane if we're going from Greensburg to Pratt, the one

20  right outside of Pratt; correct?

21  A.   Correct.

22  Q.   Did any of the questions Mr. Murphy asked you change your

23  opinion that the cause of this collision -- about the cause of

24  the collision?

25  A.   No.
```

1    Q.   And it's been your testimony the cause of the collision --

2    what caused it was what?

3          MR. MURPHY:  Your Honor, I object again.  This is --

4    for the same reasons argued last week --

5          THE COURT:  Sustained.

6           MR. JAMES:  I don't have any additional questions,

7    Your Honor.

8    ********End of the proceedings requested transcribed*******

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2          I, Annie S. States, United States Court Reporter in

3    and for the District of Kansas, do hereby certify:

4          That the above and foregoing proceedings were taken

5    by me at said time and place as a stenomask voice writer;

6          That thereafter said proceedings were transcribed

7    under my direction and supervision by means of computer-aided

8    transcription, and that the above and foregoing constitutes a

9    full, true, and correct transcript of said proceedings;

10          That I am a disinterested person to the said

11   action.

12          IN WITNESS WHEREOF, I hereto set my hand on this

13   the 24th day of April, 2025.

14

15                    /s/ Annie S. States
                  Annie S. States, CCR, CVR, RVR-M
16                  United States Court Reporter

17

18

19

20

21

22

23

24

25